Okay, counsel, please approach, let us know your names and who you represent. Although you're known to us, I should say. Good morning, Your Honors. My name is Gilbert Lenz. I'm representing Defendant Kenneth Sharples. Okay. Good morning, Your Honors. I'm Peter Fisher, an Assistant State's Attorney on behalf of the people. Okay. You're KG veterans. You know the drill. Fifteen minutes aside. Save some time for rebuttal. And if we pester you too often with questions, we probably won't be all that fussy about time. Okay. Good morning, Your Honors. My client, Kenneth Sharples, did not receive a fair trial. From beginning to end, the proceedings were marred by serious trial errors, and most of those errors were bound together by one common element, the fact that my client's trial counsel failed him on repeated occasions. Based on the cumulative effect of those errors, this court must remand for a new trial. Now, as you know, we raised several issues concerning trial errors, as well as two significant sentencing issues, and I'd be happy to address the sentencing issues, time permitting. However, I'd like to start with the first three issues raised in our brief, in the order that they're raised, where the requested relief is remand for a new trial. At 7 p.m. on the day that my client was arrested, he was taken by Detective Hansen to an interview room for a cigarette break, where Detective Hansen, who then had already some indication that this may be a murder investigation, asked my client if he had anything to say. My client said three sentences, I don't have anything to say,  Detective Hansen did take him back to his cell, but then left him there alone for the next 18 hours. There's nothing in the record about what happened over those 18 hours, beyond the fact that my client was left alone. There was no evidence that he was given food or water, no evidence of a bathroom break, no evidence he had contact with any other person, and perhaps most important in this case, he was not given access to a phone, which the police had given him just about three hours before he invoked his right to counsel. This has prohibited police conduct under the Fifth Amendment and the Illinois Constitution, the Due Process Clause in the McCauley case. Miranda's very clear when it says that if you cannot afford an attorney, one will be provided to you. It indicates that you will be provided a lawyer, either one that you can retain or a public defender. It does not say that you will not be provided a lawyer until you arrive in court. In fact, Miranda cannot mean this under Illinois law. As McCauley makes clear, a defendant is entitled to a lawyer during his custodial interrogation process, and it shall be given a lawyer during that process. The police don't have an affirmative duty to then go out and get counsel for him at that point unless they want to continue the interview or the interrogation, right? If they terminate that interview at that point, they have no affirmative obligation to run out and get him a lawyer at that time. The police do not have an obligation to run out and get him a lawyer, but they do have an obligation to do something. Illinois requires that they do something, and the simplest thing they could have done here was give him a phone. Did he ask for a phone? It's not on the record that he asked for a phone, but he did invoke his right to counsel. And then the questioning terminated, right? And the questioning terminated. And certainly, Your Honors, questioning terminated. You know, he invoked both of his rights when he said, I don't have anything more to say. He invoked his right to silence and his right to counsel. Putting him back in a cell honors somewhat his right to silence, although we would argue leaving him alone for 18 hours doesn't honor that. But putting him back in a cell doesn't do anything to honor his right to counsel. And given the fact that they had given him a phone three hours earlier when the police wanted consent to search his bedroom but then did not provide him access to a phone at any point during that 18 hours, that's a violation of Illinois law. I guess the question I would have for you is that it seems under the facts of this case that they scrupulously honored his right to remain silent because they didn't talk to him once he said he wanted an attorney and he spent the next, what, 18 hours or whatever alone in his cell. That's right. The question is, do you have any solid case law that says scrupulously honor also means some affirmative steps that the police have to take in order to get him the lawyer that he had requested or indicated that he wanted? Well, to my research, it does not reveal the case exactly on point to the facts of this case. However, we're saying that the three cases we do rely on, the McCauley case on the Illinois Due Process Clause, combined with the Schooning and Schatzer cases on the Fifth Amendment, indicate that the police had a duty to do something during that 18 hours. The duty they had was to scrupulously honor the invocation of his right and cease any further questioning, right? They certainly had a duty to cease further questioning. But the question then is, what is sufficient to honor a defendant's invocation of his right to counsel? He's stuck in his cell alone. He can't contact anyone. There's no evidence that there's anyone present with him at all during that 18-hour period. And as the U.S. Supreme Court makes very clear, leaving a suspect alone in a police-dominated atmosphere, the mounting coercive pressures of that custodial situation can produce or does produce involuntary statements. And that's exactly what the Schooning court found. Schooning, in fact, I think has less serious facts, and yet the court still remanded for a new trial. In Schooning, he was given access to a phone. The police said, here's a phone. The nurse, actually, it wasn't even a police officer who denied him the phone. A nurse denied him access to a phone. And then over the next few days, he was given access to dial the phone. He wasn't able to talk to his attorney. And during those few days, he gave statements. The Schooning court said that even though he was given access to a phone at certain points during that time, the police contact effectively denied him access to a phone, denied him his right to counsel in his subsequent statements. In a case that involved a double-stabbing murder, his subsequent statements were involuntary and suppressed. So based on the interplay of McCauley, which says, and by the way, the McCauley defendant never invoked his right to counsel, and the mere fact that an attorney was present in the station asking for him was found to require suppression of his statements. Based on that and based on the mounting pressures of police custody that are identified by the Schooning and Schatzer cases, the subsequent Miranda waiver and statement at 1 p.m. the following day were involuntary and should have been suppressed. Okay. So for the questions, I move on to your lynch issue. Yes. The issue concerning the denial of continuance and the lynch evidence. In May 2005, defense counsel received in discovery a video showing the police search of Stephen Trafford's apartment, Stephen Trafford the decedent. In that video we know now that that video showed an order of protection that Stephen's estranged wife had gotten against him and that contained certain allegations that were legible in the video. What were the factual allegations in the order of protection? The factual allegations that we know about that were in the order said that Stephen, in the months before this incident, stalked Cheryl. He called her repeatedly at work. She said she felt threatened. He cut up her clothes. He poured sugar in her gas tank. He and she also reported that she knew that he had been receiving mental health treatment at two different hospitals over the previous year, Glen Oaks and Alexian Brothers. And that she was scared. She never alleged any physical violence against her personally, did she? That's right. No, she didn't. We don't know. We don't know if he was violent towards her. Counsel, can you tell me that was a DuPage County order of protection? Was it the emergency order of protection or the plenary order of protection? I believe that what they said. It's not in the record. I don't know what stage of the order of protection it was. No, that's true. The record's unclear on that point. And that was brought up. I believe that it was the complaint for an order of protection, so it was the initial, yes. Thank you. Okay. So in May 2005, counsel receives the video showing this order or complaint for an order. That's May 2005. Three and a half years later, counsel watches the video. That's late 2008. What does counsel do when he watches the video?  A year later, September 2009, this case is set to go to trial. One week before trial, counsel tells the judge, you know, we might want to call Cheryl Trafford as a lynch witness. All the parties agree at that point. Cheryl Trafford can testify. And that's based, Justice Paczynski, that's based on what we know in the record as it stands. And they, and both parties say that they're still looking for her. Two days later, counsel makes an oral request for a continuance. That's denied summarily, merely citing the fact that the case was four and a half years old. The following Monday, jury selection begins. During jury selection, a Glenn Oaks record arrives. The court knows that the Glenn Oaks record arrives. We know now that the record says that Stephen reported to Glenn Oaks in the weeks or months before this incident as being suicidal and homicidal. That was not put on the record at this point, however. It was just noted that the record had arrived. Then my client went to trial without having any lynch evidence presented. It was only after trial that counsel noted for the court at his motion for new trial in his allegation that the court denied the continuance improperly, that the record said Stephen had been suicidal and homicidal, et cetera. This, one of two things is true about this fact pattern. Either the judge abuses discretion or failed to exercise his discretion, is our first point, in denying the continuance, or counsel was entirely ineffective for failing to look into this lynch material at some point in the prior four and a half years. As this court knows, the walk... I'm just trying to show that the defendant had knowledge of these violent tendencies. Isn't that the essence of lynch? It's what the defendant knew, and therefore, why he acted the way he acted. Not necessarily that these things are facts. Well, there's two prongs to the lynch case, Your Honor. That's the first prong. The first prong is whether the defendant knew personally of any history between himself and the deceased, or had witnessed personally violence by the deceased. The second prong, though, is about the jury. It's what the jury's entitled to hear. And what the jury's entitled to hear, in a credibility determination like this, is all of the relevant admissible evidence about the victim's violent past. And counsel presented none of that evidence to this jury. But you have to satisfy both prongs. Oh, you don't? No, I'm sorry, Your Honor. No, that's correct. You don't have to satisfy both prongs. Okay. Lynch evidence is admissible under the first prong or the second prong. And we're talking about, in this case, I believe, what the jury's entitled to hear. The jury was faced with a credibility determination between competing statements from my client. They were entitled to hear more about Stephen Trafford, and they heard almost nothing about him. Counsel was entirely ineffective for not presenting that evidence, and that rendered this trial entirely unfair. Well, what about the fact that this witness was deceased at the time of trial? So how could he have been prejudiced? How did the court abuse its discretion in denying that continuance if the defendant was not prejudiced by the not granting of that continuance, if that witness was already deceased and could not have been prejudiced? Well, two responses to that, Your Honor. First, we don't know if that witness is deceased. All the parties hint at it at some point, although it's never brought up until the middle of the trial, and then only as a hint. The fact of the matter is we don't know. Did the defendant himself state that? The defendant... Affirmatively, not hinting. He affirmatively says she's dead. What my client said at his pro se post-trial motion was that she may be dead because, and his evidence for that was counsel's sidebar with the judge during the trial where he said Cheryl Trafford may be dead. And the states also said after trial Cheryl Trafford may be dead. But no one actually said Cheryl Trafford is dead. No one provided evidence of the fact that Cheryl Trafford was dead. So first and foremost, the evidence that could have been put on at this trial that would have been relevant and admissible to support my client's claim of self-defense was Cheryl Trafford herself. That should have been presented if available. But even if Cheryl Trafford is dead or was dead at the time, obviously, the argument also is that the record itself that we know about in the record was admissible. The Glenn Oaks record stating that Stephen reported being suicidal and homicidal. That is admissible under the Illinois Supreme Court case law and the Illinois statute that we cite in our briefs where mental health records may be admissible in a homicide case where it's pertinent to the charged offense. And that would be a determination for the judge to make. The judge would not ask whether that record would be admissible, but the judge would have discretion to admit a record like that. Plus, I would just add, Your Honor, there's a lot we don't know. And some speculation is required in any case like this where the allegation is fair to investigate. And the cases we cite, the two I would point to are Solomon and Gunnard. In both of those cases, defendants were sent back for a new trial where the appellate court acknowledged that we don't know what the witnesses would say necessarily, but we know that those witnesses were extremely important to the defense and defense counsel was ineffective for not presenting them. And that's exactly what happened here. But he's alleging self-defense. If we look at the totality of the evidence, it somewhat speaks against self-defense in that he took affirmative action to conceal this entire death and cleaned up his car. I mean, he didn't go to the police and say, geez, I was just attacked. And this is what happened. This was my defense. I had to kill this guy. That's not what happened. He tried to conceal all of his actions, right? And he never did come forward. It was the law enforcement authorities that discovered him and his actions, right? That's correct, Your Honor. However, as someone in that situation, I don't think there's – I think he even admits himself that he was panicky and freaked out from this incident. He – that's correct. But that speaks all the more to the prejudice issue. And the jury heard every fact you just mentioned and still had an extremely difficult time deciding this case. They deliberated almost a full day. They were sequestered overnight. They asked many questions, including two questions that indicated they were grappling with the elements of second-degree murder, some sort of mitigated culpability here. In light of all the facts that you mentioned, what they were entitled to hear was what was not presented, the lynch evidence relevant to Stephen Trafford that would have supported my client's self-defense claim. And that evidence, you believe, would basically have indicated that he intended to harm his – harm Cheryl and that he put gas in her – or put sugar in her gas tank and destroyed some clothing? Well, that's what we know about in the complaints. We don't know what Cheryl would have testified to or would testify to on retrial. However, the judge was presented with that complaint. The problem I have is that it seems like a quantum leap to then say that that means that the defendant posed a real danger to the victim here. The victim posed a danger to the defendant. Right. I understand. Well, first thing I would say about that is that Cheryl Trafford, her testimony, as the judge stated explicitly, would be admissible at trial. We don't know what else she would have testified to. We don't know what other witnesses may have seen or heard between Stephen and Cheryl who could have testified. We don't know what Stephen's mental health records, which I believe largely would have been admissible, would have said. It's true, Your Honor. We don't – there's a lot we don't know about Stephen Trafford and that's because counsel didn't present it. But this court does not need to make a quantum leap to remand for new trial in light of this because of the failure to investigate – the nature of the failure to investigate claim. As I said, in the Solomon case, the witness was an informant who allegedly entrapped the defendant. The defendant alleges what the informant told him, but we didn't know what the informant would say. But the court – this court still remanded for a new trial based on that just because counsel presented an entrapment offense and didn't present the key witness to support his own client's testimony. Why don't you move on to the sentencing issue? Sure. Well, if the court permits, I would also like to address the Freddy Krueger knife question. Okay. Have at it. Illinois law uniformly and strongly condemns the introduction of unrelated weapons evidence. Such evidence is always extremely prejudicial. This has never been more true than in this case. This case involved a stabbing and the jury was allowed to hear about and see two times photographs of the Freddy Krueger knife and the knife itself, a brass knuckles grip with three stainless steel blades, foot-long stainless steel blades protruding from it, a weapon that was as fearsome as it was irrelevant. This is second-pronged plain error. However, even if it is not second-pronged plain error, counsel was entirely ineffective for agreeing to let the jury hear about and see this knife. I would point this court to the Lamone case on this issue. In that case, the defendant was charged with simple robbery and aggravated battery and the judge allowed the police to testify that they found a handgun in his waistband when they arrested him, entirely unrelated to the offense. Mere testimony, there was a handgun, not the gun itself. And even admonished the jury that this handgun testimony was admitted only for a limited purpose. Lamone found that this is second-pronged, this is per se reversible error. Lamone in a long string of cases, Seaworth I would also point this court to, where even an objection to that evidence was sustained and this court reversed for a new trial. The last point I would make on this issue, Your Honor, is that this is especially prejudicial here where there were any number of ways to get this information before the jury. It admittedly was relevant, you know, the course of investigation, why they arrested my client, but there were numerous other ways, other than this extremely prejudicial evidence, to get that information before the jury. As Officer Rustin even testified, he could have arrested him when he admitted to smoking marijuana, when he admitted to being arrested in DuPage County, and of course they had the weapon that was used in the offense itself found in my client's apartment. That was presented to the jury, we don't object to that. They could have said that was the basis for the arrest, and yet counsel agreed, no, the basis for the arrest was a Freddy Krueger knife and allowed the state to parade it in front of the jury twice to be identified by two witnesses, and it was even published to the jury. This is per se reversible error and my client deserves a new trial. With respect to the sentencing issues, I'll briefly, Your Honor, not only did counsel fail to bar extremely prejudicial character evidence and not present relevant and admissible character evidence against Stephen Trafford, counsel was ineffective for not requesting separate verdict forms in this case.  The state argued almost exclusively felony murder in their closing argument. They even hinted at one point that if you find Charples not guilty of aggravated kidnapping, you should also find him not guilty of murder. Felony murder was... Counsel briefly argued that the sound trial strategy so as to avoid the possibility of a compromise verdict will acquit him on this murder and convict him on this murder so that the defense counsel and defendant could have easily said, let's not take that chance of a compromise verdict. Let's go all in on the murder or the self-defense. Well, and had counsel gone for an all-or-nothing strategy, that would be the case, Your Honor, and that's the Brayboy case where counsel went for an all-or-nothing strategy and this court found counsel was not ineffective for doing so, even in light of Smith. Of course, that trial was before Smith. But counsel did not go for an all-or-nothing strategy here. The jury was instructed on both theories of second-degree murder. There was already the possibility of a compromise verdict. The fact of the matter is, once the state made a decision to focus entirely on felony murder in closing argument, counsel was ineffective for not requesting separate verdict forms at that point, knowing, or should have known, that those sentences would be mandatory consecutive after trial. And I would also point out that the counsel seemed to acknowledge his own error there when, in his motion to reconsider sentence, he says, Your Honor, I recognize that I didn't request separate verdict forms and essentially pleaded with the court to apply the Smith presumption that the least serious conviction was rendered by the jury, which was a meritless argument at that point, which the judge denied properly. No reasonable trial strategy could have allowed for not requesting separate verdict forms, especially when the sentencing consequences were so severe. And that leads me to my final issue, which is the excessive sentence issue. The judge heard every single fact in this case. The judge heard evidence of mitigation and aggravation and heard the allocution, which apparently the judge found particularly aggravating. After all of that, the judge said, I'm putting you in prison for 50 years. Fifty years was the suitable term for him. When the state informed him correctly that the sentences were mandatory consecutive, the judge said, OK, make it 80, a 60 percent increase without any further reasoning, without any consideration of the factors. That was an abuse of discretion. And should this court not remand from your trial, we request that this court reduce my client's sentence to a prison term no greater than 50 years or remand for new sentencing hearing with a recommendation. If there are no further questions, I'll save some time for rebuttal. Thank you. Good morning, Ian, and may it please the Court. With regard to the first issue, the bottom line is that Edwards is still good law. If you buy the defendant's argument, if you accept the defendant's argument, then Edwards would have to be reversed, which, with all due respect, you can't do. Edwards contemplates exactly this situation. Every defendant in an Edwards situation is still in custody. Every defendant in an Edwards situation has been denied access to an attorney. That's the whole point of Edwards. Edwards has been recently affirmed even in one of the cases that the defendant cited. It was affirmed again last week in another case. Edwards is still good law, so the question is, did this defendant reinitiate? And we have to look back and remember that there was a motion to suppress statements and there was a hearing on that motion and it was held on specific allegations made by the defendant. And he said that he was not given his Miranda rights, that he was questioned after asserting his rights, that his statements were obtained by psychological and mental coercion, that he was confronted with illegally obtained evidence and he's abandoned all but one of those arguments here. But that's what the hearing was on. It was on specific allegations of police misconduct and intimidation, misrepresentations. And, of course, there was no evidence of any of this. The evidence that the court heard was that this defendant voluntarily reinitiated contact with the police. The police officer who was down there said, I can't talk to you. You've asked for a lawyer, which is what he's supposed to do. The defendant says, I want to talk to you anyway. He was re-Mirandaized. He signed a written jury, I mean, excuse me, a waiver of those Miranda rights. That was exactly what's supposed to happen in this case. And under the manifestly erroneous standard, that's entitled to wait. The judge found specifically, as required under Edwards, that the defendant's rights were scrupulously honored. The other thing to remember in this case is this is not a situation where you have a defendant who's taken off the street and they're holding him hostage until he makes a statement or something like that. This defendant knew that he had been arrested on parole violations, and he knew he wasn't going anywhere no matter if the police came back to talk to him or not. He was going back to prison for a hearing on his parole violations. So it wasn't a question of, geez, maybe I'll make a statement or I don't get out or I'm getting out if I give them what they want. He knew he wasn't going anywhere. There aren't any mounting psychological pressures in this case. There's no evidence that, and in fact he never says that I was denied food, I was denied access to the bathroom. Normally there is a bathroom in those holding cells to begin with. So this isn't a situation even where he's in an interview room. He's in a cell. He's in a lockup. He's waiting to go to prison. He's not going to go to court on this parole violation. It seems, Mr. Fisher, from looking at the record, though, that they scrupulously honored his right to get chatty. The question I have for you is, did they do anything to scrupulously honor his request for a lawyer? And does the case law, the Miranda case law, require any sort of actions on the part of police or prosecutors to be solicitous in that regard? Only if they want to talk to him again. They don't have to get him a lawyer until he goes to court. But if they want to talk to him and they cannot re-initiate contact. So if he re-initiates contact... There's no evidence of that here. Right. Well, no, he did re-initiate contact. No, I'm saying the police didn't do... No, they didn't do anything. You have to remember also that they didn't even know there was a murder in this case at first. Again, he was in there on a parole violation and during the course of him sitting there, they found, well, geez, maybe there's somebody... Even if they talk to him, they still don't have a body. So, I mean, this is an unusual fact circumstance, but certainly the police didn't do anything wrong. The first time they went and he asked for a cigarette, they gave him a cigarette, and he says, I don't want to talk to you, I want a lawyer, they don't talk to him anymore. And the police are entitled to go down and look around... Again, so they scrupulously honored his right for a cigarette, told him he didn't have to say anything, but when he said he wanted a lawyer, they didn't do anything to affect that, and that's okay. Yes, it is. They didn't have to give him a phone, for example. No, they don't. There's no case that says they have to give him a phone. The McCauley case is a specific fact situation in which there's a lawyer waiting outside and they don't tell them that there's a lawyer outside and that it's a specific fact situation unique to Illinois. Other states don't have this. It's not a U.S. constitutional requirement. It's certainly not a requirement under Edwards. It's a unique Illinois fact pattern that they didn't have anybody to talk to him, and they didn't keep that information from him. Fact pattern is completely different. In fact, once he said, I want a lawyer, not only did the interview terminate, but the officer he told that to then went and spread that to the other officers involved in the investigation. Is that right? That's correct. That's correct. And nobody came down to talk to him about this case at all. And again, the trial judge said for purposes of review we have to accept the findings. And they were based on the record, so they're correct. Excuse me. Yes. Part of the 18 hours said he was in the holding until he was sleeping, right? I assume he was, yes. He said he was. He wanted to go back to sleep. That was the first interview. And again, this is before they knew there was even suspected there was somebody dead. They knew there was some bloody clothes, but he had an explanation for that. And at the time, they had no reason, it was the thing about the dog and hitting the dog and putting him in the back seat. And they had no reason to disbelieve that at the time. They said he wanted to go to sleep and they let him go to sleep. And when he re-initiated the interview, they re-mirandized him? Yes, they did. And actually he signed a form. This is after he had slept? Yes. Yes, it is. It's the next day. Thank you. Next afternoon, in fact. With regard to the continuance, there's two things. The defendant's, the defense attorney should have found this information earlier, but it wouldn't have made any difference. I mean, clearly it was available to him. He was not diligent in getting this. There was an order of protection. But Lynch, Lynch is two prongs. And you can go with either prong. Under the first prong, the defendant can introduce evidence of which he's aware to show that his state of mind was reasonable when he claimed he was acting in self-defense. Now, clearly none of this is evidence of which he's aware, so the only thing we could go on is the second prong of Lynch. Now, the second prong of Lynch requires bad acts, prior violent acts on the part of the victim. The defendant doesn't have to know about those bad acts, but they can't be, I heard this guy is violent or anything like that. This guy did specific bad acts, convictions, people testifying to batteries, things like that. What we have here is an allegation in a complaint for a order of protection. And in that allegation, there are some potential property crimes discussed, but there's no violent acts. In there, it's also discussed that the defendant may have, or the victim may have some mental health issues. And it's interesting because this came up a couple of different witnesses. Braden Hall, the pool hall, the guy who ran leagues in a pool hall, he testified that he knew the victim. In fact, he had taken the victim a couple times to one of these hospitals for treatment. He didn't go for homicidal tendencies. He didn't go for suicidal tendencies. He went to the hospital to get off cocaine. And in fact, when they eventually got the Glen Oaks and the Alexing brothers and they got these hospital records, he was admitted to get off of cocaine and alcohol. He was a drug addict and he wanted help with that. And while he was there, he happened to speak to a psychiatrist and the psychiatrist mentioned that the victim mentioned suicidal and homicidal thoughts. How that would ever come in at a trial is beyond me. It's certainly not lynch evidence. Bad thoughts don't get into the second lynch prong. It's just not there. It's not bad acts. And again, this was a patient doctor discussion you would have had to get past privilege and then you'd have to get to relevance. There's no way in the world that this information comes in. Donna Kozak did mention that she thought that the victim might have been bipolar. Again, being bipolar is not a lynch factor. Being bipolar doesn't even say that you're a violent person. And even if it did, it couldn't come in under lynch. Lynch is very specific in the kinds of things that could come in. So, this evidence could never come in. And of course, a bigger problem is that the defendant himself believed and the parties themselves believed that this witness was dead. Both sides were looking for her before trial. The defense attorney said, Judge, we can't find her. The state's attorney said, Judge, we can't find her. They wanted to use her as a life-death witness or something like that and the state couldn't find her. After trial, she wasn't found. The parties believed she was dead. The defendant himself said he believed she was dead. There's nothing you could do. There's nothing a continuance would have done here. Even if it was lynch evidence, even if it was admitted, it wouldn't have overcome the fact that this man stabbed the victim 61 times. He had previously threatened  His actions afterward are clearly indicative of a guilty conscience. Even if you acted in self-defense, you still wouldn't drive the defense attorney away out to DuPage County and dump the body in the river in Darien. I mean, it's just not In fact, didn't he go so far as to threaten to kill a woman in his apartment after the act if she continued to inquire as to what happened? Yeah, you remember she was at the car and she's cleaning out the car and there's blood all over and she gets a hank of hair and says, this isn't dog hair. And he says, that's our story and I'll kill you if you say anything about it. So, yes, and during the course of that night, if you'll remember, he also made some phone calls to her and said, don't ask about it, I don't want to talk about it. I mean, it was very, you'd think if he asked in self-defense, he might have told her something at that point, but no, he just tells her to shut up and let's hide the whole thing and that's our story. So, it's not lynch evidence. The third issue is the introduction of the so-called Freddy Krueger knife and the problem with this is a little deeper because what happened at trial is the judge was forced into euphemisms. Less than the truth came out. The truth is that this defendant was arrested for four different reasons. On one hand, he was on a parole violation. He was doing drugs. He had one, two convictions in DuPage County for which he was on probation and those constituted parole violations. He also was in possession of this Freddy Krueger knife. None of those things was allowed under parole so the judge came up with this compromise but the compromise is really sanitizing the proof so the parole officer wasn't allowed to say he was a parole officer. He had to use the euphemism I'm a law enforcement officer. He wasn't allowed to say the defendant was on parole. He wasn't allowed to talk about the crime. That's what the truth is. In fact when the judge made his ruling the defense attorney said that sounds reasonable judge and didn't put it in the post trial motion again. The jury is entitled to know something about why the defendant was arrested. That he wasn't just plucked off the street and for no reason makes this confession to this murder this grisly murder. They have to be given some context which is why we're allowed to put in circumstances of the arrest. The circumstances of the arrest were sanitized. So we've taken the truth out and we've narrowed it down and now they don't even like that portion of it. The bottom line is the Freddy Kruger knife wasn't the balance in this case. The evidence in this case was overwhelming. So even if the judge should have let one of the other crimes in as opposed to this crime. I don't think there's any doubt that the judge would have been entitled to allow something in. He certainly kept out the fact the defendant was on parole. So the defendant got several breaks. He just didn't get all the breaks he now wants. And again, the defense attorney at trial said he thought it was a reasonable situation. The other thing defense counsel said here, and we've heard it often, is that introduction of this knife is per se error, plain error under the second prong of plain error. As you know, this is not structural error, this is not per se error. There's no such thing when you come into the introduction of evidence. The term is used far too loosely as is second prong plain error. It has to be one of those structural errors, and this is not a structural error, it's the introduction of evidence, so the term should not be used in this context. Finally, in terms of sentencing, there's two issues raised, well, there's also the issue of whether or not there should have been separate verdict in this case. There's also the issue       received 50 or less sentences in this case. There's also the issue of whether or not the defendant should have served 30 or 80 years. It is true that the judge at sentencing said that your actions on the murder are worthy of 50 years in prison, and that's what you should serve. He also did give him the 30 year sentence on the aggravated kidnapping. So clearly in the judge's mind he had portioned that the murder is worth 50 and what you did on the aggravated kidnapping is worth 30. When it was properly pointed out by the state     a handgun should never ever go before a jury, it's among the most prejudicial evidence that a jury could ever hear. And it's particularly true. If testimony about a handgun in the Lamone case was prejudicial, having the jury see and have publishing to the jury the Freddy Kruger knife twice was extremely prejudicial and requires a new trial. As to issue two on the Lynch and continuance issue, I would only note that there is a lot we don't know about the evidence about Stephen Trafford and if this court finds that the record is insufficient, this court in an alternative must remand for the Krankle inquiry that my client brought up after trial which the judge summarily refused to look into. That inquiry did not occur and on remand all these questions about what could have been provided at trial could be answered. And finally on issue one regarding the statements, the Illinois Constitution bars not only badgering witnesses into giving statements but it bars less direct methods of persuasion and the interplay of the McCauley shooning and Schatzer cases show that isolation in a police lockup is just such a method of persuasion. There is a case that requires the police to give access to a phone and that's the shooning case where they specifically found that the police actions in that case effectively denied the client's convictions and remand for a new trial. Thank you very much. Okay, thank you for the excellent briefs and arguments and we will take it under consideration and get back to you directly.